1
2
3
4
5
6
7
8

*E-FILED - 3/18/09*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| KYRON LAMONT HIGHTOWER, | ) | No. C 07-1338 RMW (PR) |
| | ) | |
| Petitioner, | ) | ORDER DENYING |
| | ) | PETITION FOR WRIT |
| vs. | ) | OF HABEAS CORPUS |
| | ) | |
| T. FELKER, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

Petitioner, a state prisoner proceeding pro se, filed a petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the petition

should not be granted. Respondent has filed an answer addressing the merits of the petition, and

petitioner has filed a traverse. Having reviewed the briefs and the underlying record, the court

concludes that petitioner is not entitled to relief based on the claims presented and denies the

petition.

## BACKGROUND

On February 21, 1999, petitioner arrived at Shamoya Brown's house. (Resp. Ex. C

(People v. Hightower, California Court of Appeal, First Appellate District, Division Two, Case

No. A102390, August 24, 2005) at 2.) Brown is the mother of two of petitioner's children. (Id.)

When petitioner arrived, Ernest Neff, also known as "Donti," ("victim"), was already there. (Id.)

The victim was the father of another of Brown's children, and Brown and the victim often

1   argued with each other about child support payments.  (Id.)

2       Petitioner and the victim argued.  (Id.)  One of them suggested "tak[ing] it outside," and

3   they both continued to argue outside.  (Id.)  Petitioner was wearing a red jacket with the letters

4   "FUBU" on the front.  The victim pushed petitioner and as petitioner followed him down the

5   street, the victim said, "Little youngster, you better step out of my face."  (Id.)  Petitioner got

6   "into" the victim's face and the two continued to argue.  (Id.)

7       Then, according to a police interview with "O.," Brown's 7-year old son, the victim said,

8   "You can't handle me."  (Id. at 3.)  Thereafter, petitioner pulled out a gun, and the victim said, "I

9   don't wanna get shot," to which petitioner replied, "You is."  (Id.)  At the same time, one witness

10   who lived across the street heard petitioner and the victim arguing, called 911, and told the

11   dispatcher that a man in a red "FUBU" jacket pulled a gun and the two men started running.  (Id.

12   at 3.)  O. also told the police that he watched the victim run into the backyard, petitioner chase

13   him, and then O. heard two gunshots.  (Id.)  Petitioner then ran out of the backyard, putting his

14   gun back into his waistband and rode off on a bicycle.  (Id.)  Four days later, petitioner turned

15   himself in.  (Id.)

16       The victim's sister, Keycha Neff, testified that Brown showed her a letter from petitioner

17   to his cousin, directing Sonja West to destroy the FUBU jacket he was wearing.  (Id.)  West is

18   the mother of another of petitioner's children, and she testified that petitioner left the jacket at

19   her house after the shooting, but denied that he directed her to get rid of it.  (Id.)  West admitted

20   that she previously told the police that petitioner told her to get rid of the jacket, but explained

21   that she only said that out of anger.  (Id.)

22       The autopsy revealed that both gunshots were fired at the victim from close range.  (Id.)

23   One shot entered the thigh, and the fatal second shot entered the left shoulder and passed through

24   the chest cavity and aorta.  (Id.)  A criminalist testified that the evidence demonstrated a

25   possibility of a struggle going on in which a gun could have gone off inadvertently.  (Id. at 4.)

26       Petitioner was charged with murder, an allegation that he personally used a firearm, and

27   intentionally discharged a firearm causing death.  (Id. at 1.)  On March 31, 2000, the jury found

28   petitioner guilty of second degree murder and found both enhancements true.  (Id. at 2.)  On

1   April 10, 2003, petitioner was sentenced to a term of 40 years to life in state prison.  (Id.)  On

2   direct appeal, the state appellate court affirmed petitioner's conviction and sentence on August

3   24, 2005.  (Id.)  The state supreme court denied a petition for review on November 30, 2005.

4   (Resp. Ex. E.)  The state supreme court denied petitioner's habeas petition on August 8, 2007.

5   (Resp. Ex. G.)  The instant petition was filed on March 7, 2007.

6                                   **DISCUSSION**

7   **A.  Standard of Review**

8           This court may entertain a petition for writ of habeas corpus "in behalf of a person in

9   custody pursuant to the judgment of a state court only on the ground that he is in custody in

10  violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

11  Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court

12  may not grant a petition challenging a state conviction or sentence on the basis of a claim that

13  was reviewed on the merits in state court unless the state court's adjudication of the claim

14  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

15  clearly established federal law, as determined by the Supreme Court of the United States; or (2)

16  resulted in a decision that was based on an unreasonable determination of the facts in light of the

17  evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  The first prong applies

18  both to questions of law and to mixed questions of law and fact, Williams v. Taylor, 529 U.S.

19  362, 384-86 (2000), while the second prong applies to decisions based on factual determinations,

20  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

21          "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

22  court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

23  law or if the state court decides a case differently than [the] Court has on a set of materially

24  indistinguishable facts."  Williams, 529 U.S. at 412-13.  A state court decision is an

25  "unreasonable application of" Supreme Court authority, falling under the second clause of

26  § 2254(d)(1), if the state court correctly identifies the governing legal principle from the

27  Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's

28  case."  Id. at 413.  The federal court on habeas review may not issue the writ "simply because

1  that court concludes in its independent judgment that the relevant state-court decision applied

2  clearly established federal law erroneously or incorrectly." Id. at 411.

3      Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination

4  will not be overturned on factual grounds unless objectively unreasonable in light of the

5  evidence presented in the state-court proceeding." Miller-El, 537 U.S. at 340.  The court must

6  presume correct any determination of a factual issue made by a state court unless the petitioner

7  rebuts the presumption of correctness by clear and convincing evidence.  See 28 U.S.C. §

8  2254(e)(1).

9      In determining whether the state court's decision is contrary to, or involved an

10  unreasonable application of, clearly established federal law, a federal court looks to the decision

11  of the highest state court to address the merits of a petitioner's claim in a reasoned decision.

12  LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  The standard of review under the

13  AEDPA is somewhat different where the state court gives no reasoned explanation of its

14  decision on a petitioner's federal claim and there is no reasoned lower court decision on the

15  claim.  When confronted with such a decision, a federal court should conduct "an independent

16  review of the record" to determine whether the state court's decision was an objectively

17  unreasonable application of clearly established federal law.  Richter v. Hickman, 521 F.3d 1222,

18  1229 (9th Cir. 2008).

19  **B.    Petitioner's Claims**

20      1.    Ineffective Assistance of Counsel

21      Petitioner claims that counsel provided ineffective assistance because: (1) counsel failed

22  to effectively present his defense theory of voluntary manslaughter (Petition memorandum, p. 3-

23  13); (2) counsel failed to select the meritorious defense theory of voluntary manslaughter, opting

24  instead to choose the weaker theory of "accident" (Id. at 14-18); (3) counsel failed to investigate

25  and interview exculpatory witnesses Reginald Atkinson and Roquel Williams (Id. at 19-21); and

26  (4) failed to object to prosecutorial misconduct (Id. at 22-32).  Petitioner further argues that the

27  cumulative effect of counsel's ineffective assistance violated his Sixth Amendment right.  (Id. at

28  33-36.)

1    A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth

2    Amendment right to counsel, which guarantees not only assistance, but effective assistance of

3    counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). The benchmark for judging any

4    claim of ineffectiveness must be whether counsel's conduct so undermined the proper

5    functioning of the adversarial process that the trial cannot be relied upon as having produced a

6    just result. Id.

7    In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner

8    must establish two things. First, he must establish that counsel's performance was deficient, i.e.,

9    that it fell below an "objective standard of reasonableness" under prevailing professional norms.

10   Id. at 687-88. Second, he must establish that he was prejudiced by counsel's deficient

11   performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional

12   errors, the result of the proceeding would have been different." Id. at 694. A reasonable

13   probability is a probability sufficient to undermine confidence in the outcome. Id.

14            a.       Presentation of defense theory and failure to select meritorious defense[1]

15   Petitioner claims that counsel should have focused on the defense theory of voluntary

16   manslaughter instead of seemingly switching to a theory of unjustifiable self-defense or

17   "accident" during closing argument. (Petition memorandum, p. 9-11.) Petitioner asserts that

18   counsel's argument that the killing was unintentional removed "voluntary manslaughter" as an

19   option the jury would consider. (Id. at 11.) To the extent counsel did present a voluntary

20   manslaughter defense, such a presentation was inept, petitioner argues, because counsel "did not

21   know the law as it pertained to voluntary manslaughter." (Id. at 12, 15.)

22   A trial attorney has wide discretion in making tactical decisions, including abandoning

23   inconsistent or unsupported defenses. See Turk v. White, 116 F.3d 1264, 1267 (9th Cir. 1997).

24   Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct

25   on strategic considerations; (2) counsel makes an informed decision based upon investigation;

26

27

28            [1] The court agrees with respondent that claims one and two are closely related.
     Therefore, the court shall address both claims simultaneously.

1   and (3) the decision appears reasonable under the circumstances.  See Sanders v. Ratelle, 21 F.3d

2   1446, 1456 (9th Cir. 1994).

3        Here, a review of the record demonstrates that counsel's decision to promote an

4   involuntary manslaughter theory of defense was reasonable under the circumstances.  See

5   Sanders, 21 F.3d at 1456.  First, counsel's attempt to persuade the jury that petitioner's shooting

6   of the victim was unintentional[2] was supported by the evidence presented.  Because there were

7   no eyewitnesses to the shooting, counsel presented expert testimony that the physical evidence

8   supported the possibility of struggle with the gun, presented evidence that the victim had a

9   history of violence, presented evidence that petitioner did not go to Brown's house knowing that

10  the victim was there, and advanced a picture of petitioner as being afraid of the victim, who was

11  much older.  Contrary to petitioner's argument, an "intent to kill" the victim was not clearly

12  obvious from the evidence presented.  (Petition memorandum, p. 10.)

13       Second, counsel's decision not to concede that petitioner had an intent to kill appears to

14  be strategically sound.  Counsel focused his closing argument as an initial matter on persuading

15  the jury that the killing was not premeditated nor committed with malice.  While counsel also

16  argued that the killing was not intentional, he maintained that the evidence could support any of

17  several theories, including "accident," i.e., involuntary manslaughter (RT 978-88, 992, 994), heat

18  of passion, i.e., voluntary manslaughter (RT 987), or imperfect self-defense (RT 987).   Thus,

19  contrary to petitioner's assertion, counsel did not "remove" voluntary manslaughter as one of the

20  possible verdicts for the jury.

21       Third, counsel's argument to the jury that the killing was unintentional was not contrary

22  to the law or unsupported by the evidence.  Although petitioner asserts that the jury was

23  instructed it could find involuntary manslaughter "only if the killing happened in the

24  performance of an lawful act . . ." (Petition memorandum, p. 16), such an assertion is incorrect.

25  The court relayed the standard jury instruction for involuntary manslaughter which defined an

26

27

28      [2]  At the time of petitioner's trial, California law included "intent to kill" as a necessary
    element of voluntary manslaughter.  See CA Penal Code § 192(a).

1   "unlawful killing" as occurring "during the commission of an unlawful act not amounting to a

2   felony which is dangerous to human life under the circumstances of it's commission" *in addition*

3   *to* occurring during the commission of an ordinarily lawful act. (RT 894.) Based on the reasons

4   above, the record does not support petitioner's assertion that counsel's closing argument

5   constituted an abandonment of a viable defense. See Hendricks v. Calderon, 70 F.3d 1032, 1042

6   (9th Cir. 1995). Accordingly, counsel's performance was not deficient.

7     Although it is unnecessary for a federal court considering a habeas ineffective assistance

8   claim to address the prejudice prong of the Strickland test if the petitioner cannot even establish

9   incompetence under the first prong, see Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir.

10  1998), even assuming deficiency, petitioner fails to demonstrate the required prejudice. See

11  Strickland, 466 U.S. at 694. A different argument by counsel on the issue of whether petitioner

12  had the requisite "intent to kill" would not have made a difference because the jury came back

13  with a verdict of second degree murder. By finding that petitioner was guilty of second degree

14  murder, the jury necessarily found that petitioner committed the killing with malice, see CALJIC

15  8.50 (CT 288), which is negated if the jury were to find either voluntary or involuntary

16  manslaughter. Even assuming petitioner is correct that counsel withdrew voluntary manslaughter

17  as a potential defense theory, petitioner fails to demonstrate prejudice because the jury not only

18  found that petitioner possessed the intent to kill, as required for both voluntary manslaughter and

19  murder, but by finding malice as well, the jury necessarily rejected the heat of passion voluntary

20  manslaughter theory that petitioner wished counsel had advanced. Accordingly, arguing a

21  voluntary manslaughter theory alone would not have changed the result of the trial.

22    In light of the above, and after a thorough and independent review of the underlying

23  record, this court concludes that the state court's denial of this claim was not contrary to or an

24  unreasonable application of clearly established federal law. See Richter v. Hickman, 521 F.3d

25  1222, 1229 (9th Cir. 2008).

26        b.  Exculpatory witnesses

27    Petitioner claims that counsel was ineffective for failing to investigate and present

28  testimony from Reginald Atkinson and Raquel Williams. (Petition memorandum, p. 19.)

1    Petitioner presents a declaration by Atkinson stating that he would have testified that he knew

2    the victim, often saw the victim carrying a gun, and a few weeks prior to the killing, saw the

3    victim asking about petitioner.  (Petition Ex. D.)  Petitioner also present a declaration by

4    Williams stating that she would have testified that two weeks prior to the killing, she saw the

5    victim drive by petitioner's aunt's house pointing what appeared to be a gun, looking for

6    petitioner, and then noticed the victim making verbal threats and hand gestures at petitioner on

7    an almost daily basis.  (Petition Ex. E.)  Petitioner asserts that counsel should have called these

8    two witnesses to support a defense theory of voluntary manslaughter because they would have

9    demonstrated that the victim sufficiently provoked petitioner over a period of time.  (Petition

10    memorandum, p. 20.)

11        A defense attorney has a general duty to make reasonable investigations or to make a

12    reasonable decision that makes particular investigations unnecessary.  See Strickland, 466 U.S.

13    at 691.  "[A] particular decision not to investigate must be directly assessed for reasonableness in

14    all the circumstances, applying a heavy measure of deference to counsel's judgments."  Silva v.

15    Woodford, 279 F.3d 825, 836 (9th Cir. 2002) (internal quotation omitted).

16        Here, with respect to the notion that the victim carried guns and generally had a history

17    of violence, any testimony these potential witnesses would have provided was cumulative.  For

18    example, Brown testified that the night before the shooting, the victim came to her house with a

19    gun because he was looking for his girlfriend (RT 448-49); the police testified that the victim's

20    criminal history involved guns (RT 766), and the parties stipulated to the victim's prior

21    convictions, including brandishing a firearm (RT 752-53).  Further, Brown testified that the

22    victim had a violent character, that he had previously threatened to kill her, that he had often hit

23    and abused her to the point of hospitalization, that at one time, he choked one of her children and

24    threw O. against the wall.  (RT 444-447.)  Therefore, testimony from Atkinson and Williams

25    would not have resulted in a different outcome at trial.  See Turner v. Calderon, 281 F.3d 851,

26    875-76 (9th Cir. 2002) (concluding that petitioner did not receive constitutionally ineffective

27    assistance of counsel where his attorney did not present cumulative testimony).

28        With respect to testimony that the victim had been looking for petitioner for two weeks

1    prior to the killing, counsel's decision to forego those two witnesses appear to be a reasonable

2    one.  Although petitioner is correct that sufficient provocation to support a theory of voluntary

3    manslaughter and negate malice can be over a short or long duration, see CALJIC 8.42, here, the

4    evidence at trial demonstrated that petitioner was the aggressor in that he chased the victim into

5    the backyard and shot him.  Had the jury heard that the victim had been searching for petitioner

6    for two weeks prior to the killing, the jury could have easily inferred that petitioner premeditated

7    and planned the killing of the victim by arming himself to prepare for an encounter.  In other

8    words, such evidence presented a risk of leading to a first degree murder verdict, and counsel

9    could have reasonable decided to avoid that risk.  Even assuming that the jury could have found

10   sufficient provocation from the testimony of the two potential witnesses, the fact that the victim

11   stated he did not want to get shot or killed and petitioner responded, "You is," combined with the

12   victim attempting to run away from petitioner, established that "sufficient time elapsed between

13   the provocation and the fatal blow for passion to subside and reason to return" such that the

14   provocation would not reduce the murder charge to manslaughter.  Id. ("If there was

15   provocation, whether of short or long duration, but of a nature not normally sufficient to arouse

16   passion, or if sufficient time elapsed between the provocation and the fatal blow for passion to

17   subside and reason to return, and if an unlawful killing of a human being followed the

18   provocation and had all the elements of murder, as I have defined it, the mere fact of slight or

19   remote provocation will not reduce the offense to manslaughter.")

20         In light of the above, and after a thorough and independent review of the underlying

21   record, this court concludes that petitioner has not shown that counsel was deficient for failing to

22   investigate and interview these two potential witnesses further.  For the same reasons, namely

23   that their testimony would not have necessarily helped petitioner and indeed presented some risk

24   of harm, there is no a reasonable likelihood that but for counsel's failure to investigate them, the

25   results of the proceeding would have been different.  The state court's denial of this claim was

26   not contrary to or an unreasonable application of clearly established federal law.  See Richter v.

27   Hickman, 521 F.3d 1222, 1229 (9th Cir. 2008).

28

1              c.      Prosecutorial misconduct

2          Petitioner claims that counsel was ineffective when he failed to object when the

3   prosecutor misstated the law on homicide, gave an improper example of voluntary manslaughter,

4   and appealed to the jury's emotional side.  (Petition memorandum, p. 23-26.)

5          "Obviously, a 'prosecutor should not misstate the law in closing argument.'" United

6   States v. Moreland, 509 F.3d 1201, 1216 (9th Cir. 2007) (quoting United States v. Berry, 627

7   F.2d 193, 200 (9th Cir. 1980).  Nevertheless, "[i]mproper argument does not, per se, violate a

8   defendant's constitutional rights."  Fields v. Woodford, 309 F.3d 1095, 1109 (9th Cir. 2002)

9   (citations omitted), amended by, 315 F.3d 1062 (9th Cir. 2002).  Furthermore, "[a]rguments of

10  counsel which misstate the law are subject to . . . correction by the court."  Boyde v. California,

11  494 U.S. 370, 384 (1990).

12         A review of the closing argument demonstrates that the prosecutor did not misstate the

13  law.  He merely argued that the evidence did not support any verdict less than a first degree

14  murder verdict, as was his right to do.  See Ceja v. Stewart, 97 F.3d 1246, 1253-54 (9th Cir.

15  1996) ("Counsel are given latitude in the presentation of their closing arguments, and courts

16  must allow the prosecution to strike hard blows based on the evidence presented and all

17  reasonable inferences therefrom.").  As such, the prosecutor properly argued to the jury that

18  there was not sufficient provocation to support a theory of voluntary manslaughter, and counsel

19  cannot be considered deficient for failing to raise an objection.  (RT 962-63.)

20         Similarly, with respect to petitioner's argument that the prosecutor gave an improper

21  example of voluntary manslaughter, a review of the prosecutor's statements reveals that his

22  example of voluntary manslaughter was not misconduct.  The prosecutor explained to the jury

23  that a "heat of passion" theory was an evolving one and gave a hypothetical "present day" fact

24  pattern that would support sufficient provocation to establish a heat of passion voluntary

25  manslaughter verdict.[3]  (RT 962.)  The record does not show that the prosecutor instructed the

26

27         [3]  The prosecutor's example was, "[S]uppose I come home, I have got guns in the car,
    and I get home and I -- you know, my child has been raped and murdered right there.  I got my
28  gun.  The rapist and the murderer is right there.  I put the gun up to him.  I say, you know, you're

Order Denying Petition for Writ of Habeas Corpus

1    jury that his example was the only type of provocation that was sufficient to support a voluntary

2    manslaughter verdict.  The prosecutor used that hypothetical as an example of what would likely

3    be sufficient provocation to support a heat of passion verdict, and attempted to characterize the

4    events surrounding the shooting of the victim in this case as something that would not

5    adequately provoke an ordinarily reasonable person into shooting.  Petitioner fails to

6    demonstrate how the prosecutor's example was improper.  See id.

7         Petitioner also claims that the prosecutor improperly called on the jury to base their

8    decision on anything other than the facts and the law.[4] (Petition memorandum, p. 30.)  There is

9    no evidence, however, that the jury relied on anything other than the instructions or the evidence

10   presented in determining their verdict.  Even if the comments were improper, petitioner has not

11   shown that he was prejudiced by any failure by counsel to object.  See Ortiz-Sandoval v. Gomez,

12   81 F.3d 891, 899 (9th Cir. 1996) (noting that the jury was directed to follow the instructions as

13   given and finding no substantial or injurious effect on the verdict considering that the alleged

14   improper comments was mentioned once, was not the focus of closing argument, and was

15   _____

16   under arrest and he says, "Screw you" or "you got me," or just smiles at me.  He leers at me.
17   And I am so outraged, I am so angry, I am so furious, you know if I were in my normal state of
     mind I would not shoot him dead.  But that type of provocation, I shoot him dead.
18        I would submit to you, under that set of facts, an ordinarily reasonable person might kill
19   under that type of legally adequate provocation. . . .
          But please, let's not prostitute this justifiable notion of some killings with adequate
20   provocation that should be voluntary manslaughter.  Let's not prostitute it and allow the
     defendant to get away with murder just because he killed his victim at the end of a verbal
21   argument."  (RT 963.)

22        [4] Specifically, petitioner points to these prosecutorial statements:

23   "The unstated premise is . . . The victim was an asshole, so why should we care?  Well, we do
24   care.  The People care.  The community cares.  There are people who care about [the victim],
     obviously."  (RT 997.)
25
     "If you believe -- if you truly believe you have a reasonable doubt that this was accidental
26   discharge during self-defense and the defendant never exhibited this conduct, never had any
27   conscious disregard for human life, never said that he was going to shoot the victim, then he is
     not guilty and you can return this verdict of accident that [defense counsel] has asked for and the
28   defendant gets to ride down on the elevator with you folks."  (RT 1014-15.)

1  contrary to the trial court's instructions).

2      Here, following the prosecutor's argument, the trial court properly instructed the jury

3  with CALJIC 8.40 regarding the definition of voluntary manslaughter, and with CALJIC 8.42-44

4  on the heat of passion necessary to reduce a homicide to manslaughter.  The trial court also

5  instructed the jury with CALJIC 1.00, which provides that "[y]ou must accept and follow the law

6  as I state it to you. . . .  If anything concerning the law said by the attorneys in their arguments or

7  at any other time during the trial conflicts with my instructions on the law, you must follow my

8  instructions," and with CALJIC 1.02, which provides that statements made by the attorneys are

9  not evidence.  Moreover, "[a] jury is presumed to follow its instructions."  Weeks v. Angelone,

10  528 U.S. 225, 234 (2000), and "to accept the law as stated by the court, not as stated by

11  counsel[,]" United States v. Medina Casteneda, 511 F.3d 1246, 1250 (9th Cir.), cert. denied, 128

12  S. Ct. 2946 (2008).

13      Accordingly, in light of the trial court's instructions, there is no reasonable probability

14  that the result would have been different had counsel objected.  Strickland, 466 U.S. at 694.  The

15  state court's denial of this claim was neither contrary to, nor an unreasonable application of,

16  clearly established law.  See Williams, 529 U.S. at 412-13.

17          d.    Cumulative effect

18      Petitioner argues that the cumulative effect of all the claims of ineffective assistance of

19  counsel demonstrates enough prejudice to warrant relief.  (Petition memorandum, p. 33.)

20  However, where, as here, there is no single constitutional error existing with respect to

21  ineffective assistance of counsel, nothing can accumulate to the level of a constitutional

22  violation.  See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002).

23      Accordingly, the court concludes that the state appellate court's decision denying relief

24  on the ground of cumulative error with respect to ineffective assistance of counsel was not

25  contrary to, or an unreasonable application of clearly established federal law, nor was it an

26  unreasonable determination of the facts in light of the evidence presented.  28 U.S.C.

27  § 2254(d)(1), (2).

28

1    2.    <u>Voluntary manslaughter jury instruction</u>

2    Petitioner claims that the instruction on voluntary manslaughter improperly instructed the

3    jury that in order to find him guilty of voluntary manslaughter, they must also find that he

4    possessed an intent to kill.  (Petition memorandum, p. 43-45.)  The instruction at issue was

5    CALJIC 8.40 and, at the time of petitioner's trial, correctly stated the law as follows:

6    The crime of voluntary manslaughter is lesser to that of murder charged in the
     Information.  Every person who unlawfully kills another human being without

7    malice aforethought but with an intent to kill, is guilty of manslaughter in
     violation of Penal Code Section 192(a).  There is no malice aforethought if the

8    killing occurred upon a sudden quarrel or a heat of passion or in the actual but
     unreasonable belief in the necessity to defend oneself against imminent peril

9    to life or great bodily injury.  In order to prove this crime, that is the crime of
     voluntary manslaughter, each of the following elements must be proved: One,

10   a human being was killed; two, the killing was unlawful; . . . three, the killing
     was done with the intent to kill, but not with malice aforethought.  (RT 889.)

11
     Petitioner relies on <u>People v. Lasko</u>, 23 Cal. 4th 101 (2000), and asserts that because the

12   instruction erroneously directed the jury that it could not find voluntary manslaughter unless it

13   also found an intent to kill, the instruction violated his right to due process.  (Petition

14   memorandum, p. 44.)

15   To obtain federal collateral relief for errors in the jury charge, a petitioner must show that

16   the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

17   process.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 72 (1991).  The instruction may not be judged in

18   artificial isolation, but must be considered in the context of the instructions as a whole and the

19   trial record.  <u>See</u> <u>id.</u>  In reviewing a faulty instruction, the court inquires whether there is a

20   "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates

21   the Constitution.  <u>Id.</u> at 72, n.4.  If an error is found, the court must also determine that the error

22   had a "substantial and injurious effect or influence in determining the jury's verdict" before

23   granting relief in habeas proceedings.  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).  A jury

24   instruction that omits or misdescribes an element of an offense is constitutional error subject to

25   "harmless error" analysis.  <u>See</u> <u>Evanchyk v. Stewart</u>, 340 F.3d 933, 940 (9th Cir. 2003).

26   The state appellate court denied this claim.  The court agreed with both parties that the

27   challenged instruction was erroneous, however, it did not reverse the conviction because it

28

1    concluded that the error was not prejudicial.  (Resp. Ex. C, p. 5-7.)  Specifically, the court

2    determined that because the jury found petitioner guilty of second degree murder, it "necessarily

3    found the killing was committed with malice."  (Id. at 6.)

> This finding of malice demonstrates that, whether or not the jury believed the
> killing was intentional, the jury did not believe the killing was committed in
> the heat of passion, accidentally, or in imperfect self-defense.  The jury had
> been instructed that each of the three foregoing circumstances would negate
> malice.  Moreover, the fact that the jury found [petitioner] intentionally
> discharged a firearm causing death demonstrates that they did not believe the
> defense theory that the gun discharged accidentally during a struggle.  (Id. at
> 7.)

Here, although the trial court erroneously stated that intent to kill is a required element of

voluntary manslaughter, that instruction by itself did not "so infect[ ] the entire trial that the

resulting conviction violates due process."  Estelle, 502 U .S. at 72.  As the record demonstrates,

the jury also received CALJIC 8.50, which explains that murder requires malice while

manslaughter does not. (CT 288.)  The jury was also instructed, through CALJIC 8.50, that

regardless of whether the killing was intentional, petitioner could not be convicted of murder

unless the State proved that, at the time of the killing, petitioner was not acting in the heat of

passion or imperfect self defense. (Id.)

Further, as in Lasko, defense counsel did not focus on voluntary manslaughter as a

primary defense theory.  In fact, as discussed above, counsel's theory of defense was involuntary

manslaughter and in closing argument, he attempted to persuade the jury that the killing was not

premeditated or deliberate.  In addition, as in Lasko, the evidence presented here strongly

suggested an intent to kill.  Witnesses overheard the victim saying he did not want to die, and the

petitioner respond that the victim was going to die.  Witnesses saw the victim running away from

petitioner, who was armed, and watched the petitioner chase him into the backyard.

Furthermore, petitioner's actions after the killing are not indicative of an unintentional killing: he

did not call an ambulance, he asked someone to "get rid of" the jacket he was wearing that day,

and he absconded from police for days.  Finally, as in Lasko, and contrary to petitioner's

assertion, "Had the jury believed that defendant unintentionally killed [the victim] in the heat of

passion, it would have concluded that it could not convict defendant of murder (because he killed

in the heat of passion) and could not convict defendant of voluntary manslaughter (because he lacked the intent to kill).  The jury most likely would have convicted defendant of involuntary manslaughter, a lesser offense included within the crime of murder, on which the jury was also instructed.  Instead, the jury convicted defendant of second degree murder, showing that it did not believe the killing was committed in the heat of passion."  Id. at 102.

In any event, the state appellate court's determination that the instructional error was harmless was not unreasonable.  In addition to the incorrect voluntary manslaughter instruction, the jury was given the options of first-degree murder, second-degree murder, and involuntary manslaughter.  Since second-degree murder requires malice, the jury's finding of second-degree murder means the jury necessarily rejected a heat of passion or unreasonable self-defense theory.  This conclusion precluded finding the petitioner guilty of voluntary manslaughter, even if the jury had been properly instructed, because without a finding of malice, the jury could not have convicted petitioner of second degree murder.

Accordingly, the court concludes that the state court's decision rejecting this claim was not contrary to, or an unreasonable application of clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d)(1), (2).

3.    Imperfect self-defense jury instruction

Petitioner claims that the trial court gave two instructions as to how imperfect or unreasonable self defense (CT 289, 297) will amount to voluntary[5] or involuntary manslaughter[6],

---

[5] "A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully, but does not harbor malice aforethought and is not guilty of murder.  This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief. . ."  (CT 289.)

[6] "When a person who is acting in what otherwise be [sic] self-defense kills another human being without malice aforethought and without an intent to kill by using deadly force which was not justifiable under the circumstances, or by the use of force which exceeded that which was reasonably necessary to repel the attack, that person is guilty of involuntary manslaughter."  (CT 297.)

1   which were undermined by another erroneous instruction stating, "A person who kills another

2   person with malice of [sic] aforethought may be found guilty of murder even where the evidence

3   otherwise establishes the right of self-defense, if the jury finds that the nature of the attack did

4   not justify the resort to deadly force, or that the force used exceeded that which was reasonably

5   necessary to repel the attack." (CT 312; Petition memorandum, p. 49-53.)

6       The state appellate court denied this claim.  The court concluded that any error was not

7   prejudicial.  (Resp. Ex. C, p. 7-8.)  Specifically, the court found that the jury was properly

8   instructed on the difference between murder and manslaughter in that one required a finding of

9   malice while the other did not.  (Id. at 7.)  The court concluded, therefore, that as in Lasko, a

10  verdict of second degree murder necessarily required the jury to find that petitioner did not act in

11  unreasonable self-defense, because, as the instructions stated, a person who acts in unreasonable

12  self-defense does not harbor malice aforethought.  (Id.)

13      Contrary to petitioner's claim, it is not reasonably likely that if the jury believed that

14  petitioner acted in unreasonable self-defense, it would have felt compelled to find him guilty of

15  murder.  (Petition memorandum, p. 53.)  First, the jury was instructed that manslaughter is the

16  "unlawful killing of a human being without malice aforethought."  (CT 282.)  The challenged

17  instruction only referred to a killing *with* malice aforethought.  (Emphasis added.)  Several other

18  given instructions continued to make that distinction clear for the jury: CALJIC 8.10 (CT 272),

19  5.17 (CT 289), 8.40 (CT 283), and 8.50 (CT 288).  Viewed in the context of the instructions as a

20  whole, see Estelle, 502 U.S. at 72, it is not reasonably likely that the challenged instruction so

21  infected the entire trial.

22      In addition, as conceded by petitioner, "[E]ven if [the victim's] threat to kill petitioner

23  had been deemed sufficient to create the need for self-defense, the danger ceased the moment

24  [the victim] ran from petitioner and, as the trial court further explained, the right to use force in

25  self-defense ended when the danger ceased to exist."  (Petition memorandum, p. 11.)  Thus, the

26  evidence did not support a theory of perfect or imperfect self-defense.  Further, the jury was

27  instructed that unreasonable self-defense was not available if the petitioner's conduct "created

28  the circumstances which legally justified his adversary's use of force, attack, or pursuit."  (CT

289.)  Here, the evidence demonstrated that petitioner brandished his firearm, the victim stated

he did not want to die, petitioner responded that the victim was going to die, the victim began to

run, and petitioner chased him, resulting the victim's death.  Considering all of the above,

petitioner's argument that he was prejudiced by the challenged instruction is unavailing.

Accordingly, the court concludes that the state court's decision rejecting this claim was

not contrary to, or an unreasonable application of clearly established federal law, nor was it an

unreasonable determination of the facts in light of the evidence presented.  28 U.S.C.

§ 2254(d)(1), (2).

4.    Confrontation Clause

Petitioner claims that the use of O.'s videotaped interview with the police violated the

Confrontation Clause because it denied him the opportunity to confront or cross-examine O.

(Petition memorandum, p. 54-56.)  Specifically, petitioner asserts that he had no means to test

O.'s initial statements to the police because at trial, O. testified that he did not remember

anything about the killing or about his statements to the police.

The Confrontation Clause applies to all out-of-court testimonial statements offered for

the truth of the matter asserted, i.e., "testimonial hearsay."  See Crawford v. Washington, 541

U.S. 36, 51 (2004).  While the Supreme Court has not articulated a comprehensive definition of

testimonial hearsay, "[w]hatever else the term covers, it applies at a minimum to prior testimony

at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."

Id. at 68.  Out-of-court statements by witnesses that are testimonial hearsay are barred under the

Confrontation Clause unless (1) the witnesses are unavailable, and (2) the defendants had a prior

opportunity to cross-examine the witnesses.  Id. at 59.  However, the Confrontation Clause does

not bar the admission of testimonial hearsay when the declarant appears for cross-examination at

trial.  Id. at 59 n.9 (citing California v. Green, 399 U.S. 149, 162 (1970)).

The state appellate court denied petitioner's Confrontation Clause claim.  Specifically,

the court relied on Crawford's statement that "when the declarant appears for cross-examination

at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial

statements . . . .  The Clause does not bar admission of a statement so long as the declarant is

1    present at trial to defend or explain it." (Resp. Ex. C, p. 9, <u>quoting</u> <u>Crawford</u>, 541 U.S. at 59

2    n.9.)  The court explained that because O. testified and was available at trial for cross-

3    examination, there was no Confrontation Clause violation.  (<u>Id.</u>)

4    A review of the record indicates that O. indeed appeared at trial and was made available

5    for cross-examination.  "[T]he Confrontation Clause is not violated by admitting a declarant's

6    out-of-court statements, as long as the declarant is testifying as a witness and subject to full and

7    effective cross-examination."  <u>Green</u>, 399 U.S. at 158.  Because the Confrontation Clause only

8    guarantees an opportunity for effective cross-examination, the fact that at trial, O. claimed to not

9    remember much of the preceding events does not implicate a violation of the Confrontation

10   Clause.  <u>See</u> <u>United States v. Owens</u>, 484 U.S. 544, 599 (1988).

11   Accordingly, the court concludes that the state court's decision rejecting this claim was

12   not contrary to, or an unreasonable application of clearly established federal law, nor was it an

13   unreasonable determination of the facts in light of the evidence presented.  28 U.S.C.

14   § 2254(d)(1), (2).

15        5.    <u>Admission of evidence</u>

16   Petitioner claims that the trial court erred in allowing the victim's sister, Keycha Neff, to

17   testify regarding evidence that petitioner had written a letter to his cousin, asking him to get rid

18   of the gun and his FUBU jacket after the killing. (Petition memorandum, p. 61.)  Petitioner

19   asserts that the admission of such evidence was an abuse of discretion because it was

20   inadmissible hearsay and violated the secondary evidence rule.  (<u>Id.</u> at 62-63.)

21   A state court's evidentiary ruling is not subject to federal habeas review unless the ruling

22   violates federal law, either by infringing upon a specific federal constitutional or statutory

23   provision or by depriving the defendant of the fundamentally fair trial guaranteed by due

24   process.  <u>See</u> <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984).  Failure to comply with state rules of

25   evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due

26   process grounds.  <u>See</u> <u>Henry v. Kernan</u>, 197 F.3d 1021, 1031 (9th Cir. 1999).  The due process

27   inquiry in federal habeas review is whether the admission of evidence was arbitrary or so

28   prejudicial that it rendered the trial fundamentally unfair.  <u>See</u> <u>Walters v. Maass</u>, 45 F.3d 1355,

1    1357 (9th Cir. 1995). But note that only if there are no permissible inferences that the jury may

2    draw from the evidence can its admission violate due process. See Jammal v. Van de Kamp, 926

3    F.2d 918, 920 (9th Cir. 1991).

4        The state appellate court denied petitioner's claim on state law grounds. Specifically, it

5    concluded that admission of testimony regarding the letter was not inadmissible under the

6    hearsay rule because it was inconsistent with witness Brown's testimony. See Cal. Evid. Code

7    § 1235[7]. The state court went on to state that the admission also did not violate the secondary

8    evidence rule, because admission of the evidence would not be unfair. See Cal. Evid. Code

9    § 1521(a)[8]. (Resp. Ex. C, p. 10-11.) Further, the state appellate court found that even if the

10   admission was error, it was harmless because there was other evidence that petitioner had asked

11   Sonja West to dispose of his gun and jacket. (Id. at 11.) Although West denied it at trial, she

12   "acknowledged that she made a contrary statement in the videotaped police interview." (Id.)

13   Accordingly, the state court ruled that the challenged admission of evidence was not prejudicial.

14       The California Court of Appeal reasonably concluded that the trial court did not err in

15   admitting Neff's testimony regarding witness Brown's statement under California's inconsistent

16   statement exception to the hearsay rule. Brown testified that petitioner's cousin showed her a

17   letter from petitioner, but it had nothing to do with the disposal of the gun or the jacket. In

18   response, the prosecution had Neff testify that Brown previously told her differently. Similarly,

19   the California Court of Appeal reasonably concluded that the trial court did not abuse its

20   discretion in ruling that the testimony was not barred by the secondary evidence rule. There is

21   simply no showing that the admission of Brown's inconsistent statement violated a specific

22   federal constitutional provision or deprived petitioner of the fundamentally fair trial guaranteed

23

24   _____

25       [7] "Evidence of a statement made by a witness is not made inadmissible by the hearsay
     rule if the statement is inconsistent with his testimony at the hearing. . ."

26
27       [8] "The content of a writing may be proved by otherwise admissible secondary evidence.
     The court shall exclude secondary evidence of the content of writing if the court determines
     either of the following: (1) A genuine dispute exists concerning material terms of the writing
28   and justice requires the exclusion. (2) Admission of the secondary evidence would be unfair."

1   by due process.

2       Even assuming error in the admission of such evidence, petitioner fails to demonstrate

3   how such admission was prejudicial in light of the fact that the jury heard witness West testify

4   that she previously told the police petitioner asked her to dispose of his gun and jacket.

5   Accordingly, such admission of evidence did not render the trial fundamentally unfair.  See

6   Walters, 45 F.3d at 1357.

7       The court concludes that the state court's decision rejecting this claim was not contrary

8   to, or an unreasonable application of clearly established federal law, nor was it an unreasonable

9   determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d)(1), (2).

10      6.      Cumulative error

11      Petitioner claims, in general, that he was deprived of a fair trial, in light of the cumulative

12   effect of all the claims raised.  (Petition memorandum, p. 65-66.)  In some cases, although no

13   single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several

14   errors may still prejudice a defendant so much that his conviction must be overturned.  See

15   Alcala v. Woodford, 334 F.3d 862, 893-95 (9th Cir. 2003).  Cumulative error is more likely to be

16   found prejudicial when the government's case is weak.  Parle v. Runnels, 505 F.3d 922, 928 (9th

17   Cir. 2007).  "[W]here the combined effect of individually harmless errors renders a criminal

18   defense far less persuasive than it might [otherwise] have been, the resulting conviction violates

19   due process."  Id. at 927 (internal quotation omitted).

20      Here, the only trial errors that occurred were the instructional errors discussed above,

21   which the court has already concluded individually, were not prejudicial.  In light of the strength

22   of the government's case, this court concludes that the alleged errors, even when considered

23   together, did not render petitioner's defense "far less persuasive," nor did they have a

24   "substantial and injurious effect or influence on the jury's verdict."  Id. at 928.

25      Further, petitioner cites no Supreme Court precedent, and the court is aware of none,

26   providing that the cumulative effect of numerous alleged errors, no one of which is prejudicial,

27   may violate a defendant's due process right to a fair trial.  The Supreme Court has, however,

28   long recognized that, "given the myriad safeguards provided to assure a fair trial, and taking into

account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial." United States v. Hasting, 461 U.S. 499, 508-509 (1983). The AEDPA mandates that habeas relief may only be granted if the state courts have acted contrary to or have unreasonably applied federal law as determined by the United States Supreme Court. Williams v. Taylor, 529 U.S. 362, 412 (2000). In the absence of Supreme Court precedent recognizing a claim of "cumulative error," therefore, habeas relief cannot be granted.

Accordingly, the court concludes that the state appellate court's decision regarding the cumulative effect of any error was not contrary to, or an unreasonable application of clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1), (2).

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The Clerk shall enter judgment for respondent and close the file.

IT IS SO ORDERED.

Dated:  3/16/09

RONALD M. WHYTE
United States District Judge